EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Wilfredo Rosario Díaz, Ruth Fontánez Alicea, Etc. Demandantes-Recurridos vs. Toyota de Puerto Rico, Corp. Sec. De Justicia del E.L.A. de P.R. y Otros Demandados-Peticionarios | Certiorari 2005 TSPR 154 165 DPR _____ |

Número del Caso: CC-2002-825

Fecha: 24 de octubre de 2005

Tribunal de Apelaciones:

Circuito Regional de San Juan-Panel IV

Juez Ponente:

Hon. Charles Cordero Peña

Abogados de la Parte Peticionaria:

Lcda. Alexandra Fernández Navarro

Abogada de la Parte Recurrida:

Lcdo. Juan M. Suárez Cobo

Oficina del Procurador General:

Lcda. Laura L. López Roche
Procuradora General Auxiliar

Materia: Violación de Derechos Civiles, Daños y Perjuicios, Constitucionalidad de Ley 254 de 27 de julio 1974.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wilfredo Rosario Díaz,
Ruth Fontánez Alicea, Etc.

    Demandantes-Recurridos

         vs.                  CC-2002-825   Certiorari

Toyota de Puerto Rico, Corp.
Sec. de Justicia del E.L.A. de
P.R. y Otros

    Demandados-Peticionarios

SENTENCIA

San Juan, Puerto Rico, a 24 de octubre de 2005.

En el caso de autos, la empresa Toyota Corp. de Puerto Rico (en adelante Toyota) le negó un empleo a Alfredo Rosario Díaz (en adelante Rosario) por razón de las convicciones que aparecían reflejadas en el certificado policíaco de antecedentes penales de éste.

Por razón de lo anterior, Rosario presentó una demanda de daños y perjuicios contra Toyota mediante la cual, en lo pertinente aquí, alegó que la actuación de la empresa referida constituyó un acto de discrimen por condición social prohibido por la Constitución del Estado Libre Asociado de Puerto Rico.

El foro de instancia desestimó la demanda de Rosario por entender que el demandante no había demostrado que la categoría de ex-convicto estuviera incluida en el concepto constitucional de "condición social".

El Tribunal de Apelaciones revocó la sentencia del foro de instancia. Dictaminó que al interpretar las alegaciones en la demanda de Rosario del modo más favorable a éste, Rosario podía ser acreedor en derecho a la concesión de un remedio.

Toyota acudió ante nos oportunamente, y el 13 de diciembre de 2002 expedimos el recurso de *certiorari* solicitado por éste.

Luego de los procedimientos y trámites de rigor, **el Tribunal se encuentra igualmente dividido en cuanto a la solución de este caso**. Por ende, se confirma por empate el dictamen del foro apelativo y se devuelve el caso al foro de instancia para que se continúen los procedimientos.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal. El Juez Asociado señor Rebollo López emitió Opinión de Conformidad, a la que se unen el Juez Asociado señor Rivera Pérez y la Juez Asociada señora Fiol Matta.

El Juez Asociado señor Fuster Berlingeri emitió Opinión Disidente, a la que se unen el Juez Presidente señor Hernández Denton y la Juez Asociada señora Rodríguez Rodríguez. La Juez Asociada señora Rodríguez Rodríguez, además, emitió una Opinión Disidente particular.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Suprem

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wilfredo Rosario Díaz, Ruth
Fontanez Alicea y la Sociedad
Legal compuesta por ambos

     Recurridos

        vs.                  CC-2002-825     CERTIORARI

Toyota de Puerto Rico Corp.,
*et al.*

     Peticionarios

OPINIÓN DE CONFORMIDAD EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ, A LA CUAL SE UNEN EL JUEZ ASOCIADO SEÑOR RIVERA PÉREZ Y LA JUEZ ASOCIADA SEÑORA FIOL MATTA

San Juan, Puerto Rico 24 de octubre de 2005

Al redactar nuestra Carta Magna nuestros constituyentes establecieron una prohibición, expresa e inequívoca, contra el discrimen por razón de condición social. Años más tarde, la Asamblea Legislativa instrumentó dicha prohibición, extrapolándola al ámbito obrero-patronal, mediante la aprobación de la Ley Núm. 100 de 30 de junio de 1959, mejor conocida como la Ley Anti-Discrimen, 29 L.P.R.A. Sec. 146 *et seq*.

Lo anteriormente expuesto, ni está en controversia ni puede ser negado o ignorado por aquellos que pretenden restringir los postulados.

de nuestra Constitución, soslayando de esa forma los claros cimientos --constitucionales y estatutarios-- que rigen nuestro ordenamiento jurídico.

En el día de hoy tres integrantes de este Tribunal, <u>ignorando las lamentables vicisitudes que confrontan las</u> <u>personas convictas de delito a la hora de procurar empleo</u>, se niegan a asumir su trascendental función revisora, como últimos intérpretes de nuestra Constitución y nuestras leyes, <u>rehusando establecer lo que claramente constituye "discrimen</u> <u>por condición social</u>"; ello, ante el fundado temor de que, al así hacerlo, arriben inevitablemente a una definición más abarcadora de lo que sus convicciones jurídicas le permiten proteger constitucionalmente. Veamos.

I

En marzo de 1996, el aquí recurrido, señor Wilfredo Rosario Díaz --habiendo sido referido por el Departamento del Trabajo y Recursos Humanos del Estado Libre Asociado de Puerto Rico-- acudió a una entrevista de trabajo ante la peticionaria, la corporación Toyota de Puerto Rico (en adelante Toyota). Rosario Díaz fue entrevistado por el señor Wilfredo Torres Rodríguez, coordinador de recursos humanos de la Toyota, <u>indicándosele que cumplía con todos los requisitos</u> <u>para ocupar el puesto de chofer de almacén</u>.

Posteriormente, Rosario Díaz acudió a una segunda entrevista, esta vez ante el gerente de almacén de la

Toyota, una persona de apellido Langa.[1] Luego, el señor Torres Rodríguez se comunicó telefónicamente con Rosario Díaz, informándole a éste que debía pasar por las oficinas de Toyota para hacerle unas pruebas de dopaje antes de comenzar a laborar el próximo lunes en la compañía demandada. Se le solicitó, además, que procediera a tramitar el "certificado de buena conducta" y el "certificado de salud" y que proveyera evidencia de haber realizado dichas gestiones. Ese mismo día, el señor Rosario Díaz le entregó a Toyota los documentos solicitados, esto es, los certificados requeridos.

Al entregar el Certificado de Antecedentes Penales --en el cual constaba que Rosario Díaz, aproximadamente 20 años antes, había sido convicto de Homicidio Involuntario y de una violación a la Ley de Armas-- éste le informó al señor Wilfredo Torres que había realizado diligencias para eliminar dichas convicciones, pero que las mismas habían sido infructuosas.[2] En ese momento, el señor Wilfredo Torres le indicó a Rosario Díaz que tenía que paralizar los trámites de empleo hasta tanto se asesorara con su supervisor.

---

[1] No surge del expediente el nombre completo de esta persona.

[2] Cabe mencionar que, según indica la parte demandante recurrida, los delitos fueron cometidos cuando Rosario Díaz contaba con 21 años de edad. Alega también la parte recurrida que el señor Rosario Díaz no ha vuelto a delinquir luego de cometido este acto en su juventud, se casó, formó una familia y ha procreado dos hijas en su matrimonio.

Días después, según surge de las determinaciones de hechos del Tribunal de Primera Instancia, un ejecutivo de la Toyota se comunicó con Rosario Díaz <u>indicándole que no se le había dado el visto bueno a su contratación debido a las convicciones reflejadas en el Certificado de Antecedentes Penales.</u>

Luego de ser informado de la decisión, Rosario Díaz se reunió con la señora Grace Meléndez, la oficial de colocaciones del Departamento del Trabajo que lo había referido a la Toyota. El 24 de mayo de 1996, la señora Meléndez prestó una declaración, bajo juramento, ante el notario Luis A. Defilló Rosas. En la misma expresó:

> Que durante el mes de marzo de 1996, posterior a la(s) entrevistas que tuviera el Sr. Wilfredo Rosario Díaz con la compañía Toyota de Puerto Rico y/o con el Sr. Wilfredo Torres, mantuve una conversación con el Sr. Wilfredo Torres. <u>En esta conversación, el Sr. Wilfredo Torres me expresó que Toyota de Puerto Rico mantiene una política de no reclutar o emplear a personas con antecedentes penales y que por razón de esta política no podía reclutar como empleado al Sr. Wilfredo Rosario Díaz.</u> El Sr. Wilfredo Torres también me expresó que de haber conocido con anterioridad a la entrevista, del Sr. Wilfredo Rosario Díaz, que éste tenía antecedentes penales, <u>no se le hubiera ofrecido la posición o plaza que estaba disponible.</u> (énfasis suplido).

Así las cosas, el 14 de marzo de 1997, Rosario Díaz, su esposa Ruth Fontánez Alicea y la Sociedad Legal de Bienes Gananciales por ellos compuesta, presentaron una demanda contra la Toyota ante el Tribunal de Primera Instancia, Sala Superior de San Juan, sobre violación de

derechos civiles, daños y perjuicios e impugnando la constitucionalidad de la Ley Núm. 254 de 27 de julio de 1974, 34 L.P.R.A. sec. 1725. En la demanda se incluyó al Secretario de Justicia en su carácter oficial como codemandado.

Los esposos Rosario-Fontánez alegaron en su demanda que la Toyota le había hecho una oferta formal de empleo a Rosario Díaz, que luego retiró al conocer el contenido de su récord penal. Indicaron que tal actuación constituyó un acto discriminatorio por "condición social" y una intrusión ilegal y caprichosa en su intimidad que, además, viola su derecho constitucional a la integridad, al trabajo y a la búsqueda de la felicidad. Alegaron también que la Ley Núm. 254, ante, es inconstitucional ya que se ha convertido en un mecanismo a través del cual todas las personas convictas de algún delito en Puerto Rico se exponen a ser objeto de discrimen.

Luego de varios incidentes y trámites procesales, la Toyota presentó ante el Tribunal de Primera Instancia una moción de desestimación bajo el fundamento de que la demanda no aducía una reclamación que justificara la concesión de un remedio, toda vez que actuó legítimamente al denegarle el puesto al recurrido. Dicho foro desestimó la demanda presentada. Concluyó el tribunal primario que las alegaciones de la demanda no exponían una causa de acción que justificara la concesión de un remedio y que podía disponer del asunto sin entrar a considerar los

planteamientos de inconstitucionalidad de la Ley Núm. 254, ante.

El 13 de agosto de 2001, el hoy recurrido matrimonio Rosario-Fontánez presentó un escrito de apelación ante el Tribunal de Apelaciones alegando que el tribunal de instancia erró al entender que la condición de ex-convicto no es una "condición social" a los efectos de nuestra Constitución y que erró de igual manera al entender que procedía la desestimación de la demanda por no exponer una reclamación que justifique la concesión de un remedio.

El 19 de agosto de 2002, luego de varios trámites procesales y contando con la comparecencia del Secretario de Justicia y del Procurador General, el foro apelativo intermedio revocó la sentencia apelada, indicando que "examinadas todas las alegaciones de la demanda y ante los hechos esbozados y la jurisprudencia aplicable, es forzoso concluir que el Tribunal de Primera Instancia erró al desestimar la demanda". El referido foro apelativo concluyó, además, que "al interpretar las alegaciones de ésta, lo más liberalmente posible a favor del demandante, Rosario Díaz, éste puede ser acreedor en derecho a la concesión de un remedio", esto, a la luz de la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico.[3]

---

[3] El Tribunal de Apelaciones declaró sin lugar, posteriormente, una moción de reconsideración presentada por la Toyota en el caso de autos.

Inconforme con la actuación del tribunal apelativo intermedio, la Toyota acudió ante este Tribunal, alegando que procede revocar la sentencia emitida por el tribunal apelativo debido a que dicho foro erró:

> . . . al revocar la Sentencia dictada por el Tribunal de Primera Instancia y concluir que el demandante, por ser ex-convicto, es acreedor de algún remedio en ley que impide la desestimación de la demanda de discrimen por condición social.

Expedimos el recurso. En el día de hoy, y por estar igualmente dividido el Tribunal, se emite una Sentencia confirmatoria de la emitida por el Tribunal de Apelaciones.

## II

En el entorno procesal, la Regla 10.2 de Procedimiento Civil, 32 L.P.R.A. Ap.III, R. 10.2, permite al demandado solicitar que se desestime la demanda en su contra cuando, entre otras razones, ésta "no expone una reclamación que justifique la concesión de un remedio". A los fines de disponer de una moción de desestimación, el tribunal está obligado a dar por ciertas y buenas todas las alegaciones fácticas de la demanda radicada. Harguindey Ferrer v. Universidad Interamericana, 148 D.P.R. 12 (1999); Ramos v. Marrero, 116 D.P.R. 357 (1985). El promovente de la moción de desestimación tiene que demostrar que, presumiendo que lo allí expuesto es cierto, la demanda no expone una reclamación que justifique la

concesión de un remedio. <u>Pressure Vessels</u> v. <u>Empire Gas</u>, 137 D.P.R. 497 (1994). Esta doctrina se aplica solamente a hechos bien alegados y expresados de manera clara y concluyente, que de su faz no den margen a dudas. <u>La demanda no deberá ser desestimada a menos que se desprenda con toda certeza que el demandante no tiene derecho a remedio alguno bajo cualquier estado de hechos que puedan ser probados en apoyo a su reclamación</u>. Véase: <u>Pressure Vessels</u> v. <u>Empire Gas</u>, ante. Véase, además: <u>Sucesión de Rafael Gilberto Concepción</u> v. <u>Banco de Ojos del Leonismo Puertorriqueño</u>, res. el 28 de febrero de 2001, 2001 T.S.P.R. 24.

En su aspecto sustantivo, el caso ante nos tiene su base jurídica en la Sección 1 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico, <u>la cual prohíbe expresamente el establecimiento de discrimen alguno por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas</u>.[4] Este precepto constitucional rige el ámbito obrero-patronal y está instrumentado en la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. secs. 146 *et seq.*, la

---

[4] Dicha Sección reza como sigue:
"La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana".

cual prohíbe el discrimen en el empleo. Afanador Irizarry v. Roger Electric, res. el 26 de abril de 2002, 2002 T.S.P.R. 56; Rodríguez Meléndez v. Sup. Amigo, Inc., 126 D.P.R. 117 (1990).

La Ley Núm. 100, ante, en conjunto con otros estatutos germanos, forma parte de un ordenamiento integral diseñado por la Asamblea Legislativa de Puerto Rico para dar vigencia, dentro del contexto de las relaciones obrero patronales, a los valores sobre los cuales se erige nuestra sociedad democrática. Ortiz y otros v. Municipio de Lajas, res. el 30 de marzo de 2001, 2001 T.S.P.R. 44. Para afianzar dichos principios en los centros de trabajo, este entramado de leyes concibe la creación de un "esquema remedial con todos los instrumentos necesarios para reparar a las víctimas de los daños causados por el discrimen en el empleo." García Pagán v. Shiley, 122 D.P.R. 193 (1998). Véanse, además: García Benavente v. Aljoma Lumber, res. el 21 de julio de 2004, 2004 T.S.P.R. 125, y Afanador v. Roger Electric, ante.[5]

---

[5] El Artículo 1 de la Ley 100, ante, dispone que incurrirá en responsabilidad "[t]odo patrono que despida, suspenda o discrimine contra un empleado suyo en relación a su sueldo, salario, jornal o compensación, términos, categorías, condiciones o privilegios de su trabajo, o que deje de emplear o rehúse emplear o reemplear a una persona, o limite o clasifique sus empleados en cualquier forma que tienda a privar a una persona de oportunidades de empleo o que afecten su status como empleado, por razón de edad, según ésta se define más adelante, raza, color, sexo, origen social o nacional, condición social, afiliación política, o ideas políticas o religiosas del

(Continúa . . .)

En cuanto a la interpretación constitucional de las leyes, hemos reconocido que es principio de hermenéutica firmemente establecido, que el poder judicial debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de una ley. Banco Popular de Puerto Rico v. Municipio de Mayagüez, 126 D.P.R. 653 (1990); P.R.P v. E.L.A., 115 D.P.R. 631, 642 (1984); Milán Rodríguez v. Muñoz, 110 D.P.R. 610, 618 (1981); Mari Brás v. Alcaide, 100 D.P.R. 506, 513 (1972). Es también una norma jurisprudencial de autolimitación judicial que no se considerará el aspecto

_____

empleado o solicitante de empleo". 29 L.P.R.A. secc. 146 (énfasis suplido).

El Artículo 3 de la referida Ley, por su parte, dispone que ante casos de discrimen por razón de edad, raza, color, religión, sexo, origen social o nacional o condición social se presumirá que los actos discriminatorios fueron cometidos en violación de la ley cuando los mismos hayan sido realizados sin justa causa. Esta presunción será de carácter controvertible. Una vez el empleado establece las circunstancias esenciales para que el juzgador pueda asumir el hecho presumido --que el despido o acción perjudicial se realizó sin justa causa-- se invierte la carga probatoria. Corresponde al patrono rebatir la presunción del discrimen y demostrar con preponderancia de la prueba, que el despido no fue discriminatorio. Esto es, que se presentará evidencia de calidad suficiente para convencer al juzgador que la existencia del discrimen era menos probable que su inexistencia. Si el patrono demuestra, a satisfacción del tribunal, que la razón discriminatoria alegada por el demandante no fue motivo determinante para el despido, quedará rebatida la presunción. Derrotada la presunción le corresponde al demandante presentar prueba dirigida a establecer la existencia de discrimen. Belk v. Martínez, 146 D.P.R. 215 (1998) Véanse, además, los casos allí citados y Díaz Fontanez v. Wyndham Hotel Corp., res. el 24 de octubre de 2001, 2001 T.S.P.R. 141.

constitucional de una ley cuando se puede resolver un asunto mediante un análisis estatutario. P.P.D. v. Admor. General de Elecciones, 111 D.P.R. 199, 243 (1981); Pacheco v. Srio. Instrucción Pública, 108 D.P.R. 592, 601 (1979).

Sobre este tema, en Domínguez Maldonado v. E.L.A., 137 D.P.R. 954, 964 n. 4 (1995), nos expresamos de la siguiente manera:

> Hemos sostenido que un tribunal tiene que hacer lo posible para evitar los dictámenes precipitados en cuestiones constitucionales y, sobre todo, debe decidir esas cuestiones sólo cuando no pueda disponer de otra manera del caso ante su consideración. Milán Rodríguez v. Muñoz, 110 D.P.R. 610, 619 (1981).
>
> En nuestra jurisdicción los planteamientos constitucionales no pueden abordarse cuando un caso pueda resolverse: (1) mediante un análisis estatutario válido; (2) en armonía con los criterios de las partes y en consonancia con los mejores fines de la justicia; (3) al existir una interpretación razonable de la legislación que permita soslayar la cuestión constitucional presentada, y (4) porque la controversia puede quedar resuelta definitivamente por otros fundamentos. P.P.D. v. Admor. Gen. de Elecciones, 111 D.P.R. 199, 243 (1981); Molina v. C.R.U.V., 114 D.P.R. 295 (1983); Galarza Soto v. E.L.A., 109 D.P.R. 179, 180 esc. 7(1979); Pacheco v. Srio. Instrucción Pública, 108 D.P.R. 592, 601 (1979); Mari Brás v. Alcaide, 100 D.P.R. 506, 513 (1972); Calderón, Rosa-Silva & Vargas v. García, 120 D.P.R. 803, 811-812 (1988); E.L.A. v. Aguayo, 80 D.P.R. 552, 596 (1958); Vives Vázquez v. Tribunal Superior, 101 D.P.R. 139, 150 (1973).

### III

Con este trasfondo doctrinal en mente, abordamos la controversia ante nuestra consideración, esto es, determinar si el demandante y recurrido Rosario Díaz tiene

derecho a algún remedio que impida la desestimación de plano de su caso, según promovido ante el Tribunal de Primera Instancia. Ello no obstante, para contestar esta interrogante, es menester resolver, _primeramente_, la siguiente: ¿Es el discrimen por convicciones criminales previas una de las modalidades de discrimen proscritas por la Constitución del Estado Libre Asociado de Puerto Rico y la Ley Núm. 100 de 30 de junio de 1959, según enmendada? [6]

Los esposos recurridos Rosario-Fontánez sostienen en su alegato que el discrimen por convicciones criminales previas es una modalidad de discrimen por condición social prohibida por nuestra Constitución. La peticionaria Toyota de Puerto Rico y el Procurador General discrepan de tal apreciación. Veamos.

A.

En pocas ocasiones hemos tenido la oportunidad de expresarnos en cuanto al alcance del término constitucional y estatutario "condición social". Mucho

---

[6] Al analizar la controversia del caso de autos sobre discrimen laboral en la empresa privada debemos ponderar, en primer lugar, si el ser ex-convicto constituye una condición social. De contestar en la afirmativa dicha interrogante, pasaríamos entonces a analizar la disposición constitucional que prohíbe el discrimen por condición social por parte del Estado, para luego utilizar dicho análisis en la interpretación de la Ley 100, ante, que prohíbe el mismo tipo de discrimen en la esfera privada. Ello es posible, debido a que la identidad de redacción entre ambas normas permite la aplicación del mismo análisis en ambos contextos. Véase: José Álvarez, _Derecho Constitucional_, 69 REV. JUR. U.P.R. 419, 454 (2000).

menos hemos tenido oportunidad para expresarnos sobre la legitimidad de las prácticas discriminatorias en el empleo cuando éstas se fundamentan en las convicciones criminales previas del empleado o candidato a un puesto laboral.

Surge del Diario de Sesiones de la Convención Constituyente que la expresión "condición social" no constaba en el texto original del proyecto presentado en 1951 por la Comisión de la Carta de Derechos. Sin embargo, y ante una propuesta del delegado señor Lino Padrón Rivera, se intercaló la frase "condición social" en la enumeración de discrímenes prohibidos por nuestra Constitución. [7] La moción fue secundada y aprobada inmediatamente. Diario de Sesiones de la Convención Constituyente de Puerto Rico, Edición de 1961, Tomo 2, pág. 1381.

---

[7] "El informe de la Comisión de Carta de Derechos, radicado el 14 de diciembre de 1951, recomendaba que leyese así el primer artículo:

> 'La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen social, ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana (Diario de Sesiones, vol IV, pág. 2561. Esta enmienda se hizo a sugestión de Lino Padrón Rivera. Diario . . . Vol. II, pág. 1381.)'

Así lee hoy el Artículo excepto que donde se decía 'origen social' se hizo referencia en vez por la Convención Constituyente a 'origen o condición social'." Historia Constitucional de Puerto Rico, Vol. III, Editorial de la Universidad de Puerto Rico, págs. 173-174.

Como vemos, la aprobación expedita de la enmienda del señor Padrón Rivera nos privó de una posible discusión entre los Constituyentes que arrojara luz sobre el alcance de la expresión "condición social". No obstante, con posterioridad a la aprobación de la enmienda de Padrón Rivera y al presentarse otras enmiendas a la Sección primera de la Carta de Derechos, surgió una discusión entre los Constituyentes de la cual podemos extraer el significado de dicha expresión. De particular importancia resultan las palabras que transcribimos a continuación:

> Sr. Fernández [Méndez]: ... En la línea 5, ya sabemos que se insertó la palabra 'condición' después de 'origen', 'origen o condición social'. <u>Nosotros hemos leído en la página 6 del Informe de la Carta de Derechos que 'origen social', significa que esta expresión reafirma el principio de descartar toda gradación, favoritismo o prejuicio al sopesar los méritos de una causa judicial, de una solicitud en el servicio público, de una subasta, etc., por motivo de origen o condición social.</u> Esa es la única explicación que aparece aquí en el informe de la Comisión sobre lo que es origen o condición social y da dos o tres ejemplos de en qué situaciones es que este apartado protegería a alguna persona contra otra persona. Ahora, preguntamos nosotros al Presidente de la Comisión y querríamos que nos informara en qué forma se hace válido, en qué forma se puede proteger ese derecho dentro de la estructura gubernamental que estamos creando con esta [C]onstitución, o sea, en qué forma pueda una persona que se sienta agraviada por algún discrimen en este sentido, hacer valer su derecho a que no se discrimine contra ella.
>
> Sr. Benítez: Más adelante, en las líneas quinta, sexta y séptima, se establece que 'tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana', y lo que se ha establecido aquí son ciertos principios básicos y esenciales que tienen fuerza *ex proprio vigore*, pero que además

de tener fuerza por su propio vigor habrán de requerir implementación [sic] de dos clases, educativa y jurídica. En lo que toca a la educativa, ya hay aquí un mandato al sistema de instrucción pública que habrá de respetar estos básicos principios. <u>En lo que respecta al sistema jurídico y en esto se refiere a la totalidad de la estructura legal del país, se subraya la inconstitucionalidad de todo favoritismo</u>. Y todo reconocimiento a distinción habrá de estar motivado por mérito, por virtud, por esfuerzo, por talento. En lo que toca a qué es lo que se quiere decir con origen social, <u>quiérese decir con origen social, que no importa la extracción de la persona, su situación económica, su condición en la comunidad</u>, todos los puertorriqueños y todas las personas sujetas a las leyes de Puerto Rico son iguales ante nuestras leyes si se aprueba esta disposición y cualquier intento de hacer discrimen en favor o en contra de una de ellas es ilegal. (énfasis suplido). *Ibíd*, a la pág. 1382.

En sus notas y comentarios a la Constitución, el Dr. Antonio Fernós-Isern hace una muy breve referencia a la disposición constitucional sobre origen o condición social, <u>vinculándola a la doctrina de la igualdad</u>:

> *Social Origin or Condition—This provision specifically reiterates the doctrine of individual equality before the law.* Antonio Fernós-Isern, <u>Original Intent in the Constitution of Puerto Rico</u>, Lexis-Nexis de Puerto Rico, 2 Ed., 2002, pág. 35.

De igual manera se trata el concepto en el Informe a la Asamblea Constituyente de la Comisión de la Carta de Derechos:

> *Origen social*. Esta expresión reafirma el principio de descartar toda gradación, favoritismo o prejuicio al sopesar los méritos de una causa judicial, de una solicitud en el servicio público, de una subasta, etc., por motivos de origen o condición social. <u>Diario de Sesiones de la Convención Constituyente de</u>

*Puerto Rico*, Edición de 1968, Tomo 4, pág. 2562).

En este mismo informe se indica, <u>de manera enfática</u>, que el propósito de la Sección Primera de la Constitución es:

> . . . fijar claramente como base consustancial de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la <u>igualdad esencial de todas las personas dentro de nuestro sistema constitucional. La igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura. Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño.</u> En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposición constitucional, a la vez que obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto. *Ibíd.*, a la pág. 2561. (énfasis suplido).

Todas estas ocasiones, en las que se ha hecho referencia a la expresión "origen o condición social", <u>apuntan a que su alcance abarca solamente aspectos sociales y económicos de la vida humana</u>. El profesor Raúl Serrano Geyls ha indicado que "la frase 'origen y condición social' se refiere a factores económicos y sociales" y que dicha "disposición está íntimamente ligada a la Sec. 20 del Art. II [desaprobada por el Congreso de EE.UU.] que reconocía <u>varios derechos económicos y sociales</u>". Raúl Serrano Geyls, <u>Derecho Constitucional de Estados Unidos y Puerto Rico</u>, 1ra ed., San Juan, Ed. C. Abo. P.R., 1988, Vol. II, pág. 1189. (citas omitidas y énfasis suplido).La referida Sección 20 es ilustrativa de

las condiciones de índole económica y social[8] que ampara la prohibición constitucional contra el discrimen por condición social, aunque no necesariamente exhaustiva, como veremos.

En su obra, Historia Constitucional de Puerto Rico, infra, José Trías Monge, al indagar sobre la procedencia de la Sección 1 del Art. II de nuestra Constitución, indica que el texto se inspiró principalmente en los dos primeros Artículos de la Declaración Universal de Derechos del Hombre. En ese sentido, dijimos en López Vives v. Policía de Puerto Rico, 118 D.P.R. 219 (1987) lo siguiente:

> Inspirada en la Declaración Universal de los Derechos del Hombre, la Constitución del Estado Libre Asociado de Puerto Rico tiene un origen y un historial distinto a la Constitución de Estados Unidos de América. El ánimo reformista de 'la generación del cuarenta' y la vocación liberal de los miembros de la Constituyente, caracterizaron los criterios de selección de las libertades consignadas y exigibles. Sus partes expositivas constituyen también una declaración de aspiraciones y propósitos individuales y colectivos. Con la profusa experiencia constitucional de Estados Unidos hemos construido las protecciones mínimas de los derechos fundamentales. Sin embargo, con nuestra Carta de Derechos podemos ir más lejos en la defensa de los derechos humanos. Véase J.

---

[8] Es harto conocido que esta sección no forma parte de nuestro texto constitucional, según lo dispuesto en la Ley Núm. 447 de 3 de julio de 1952 del Congreso de los Estados Unidos de América. Los derechos que con esta sección se pretendían reconocer son tanto de índole económica como social: derecho a la educación primaria y secundaria, derecho al trabajo, derecho de toda mujer en estado de embarazo o lactancia a recibir cuidados y ayudas especiales, etc.

Trías Monge, Historia Constitucional de Puerto Rico, Río Piedras, Ed. Universitaria, 1980, Vol. III, págs. 169-170. Nuestra Constitución reconoce y concede unos derechos fundamentales con una visión más abarcadora y protectora que la Constitución de Estados Unidos. Al interpretar sus contornos, debemos garantizar su vigorosidad y relevancia a los problemas socioeconómicos y políticos de nuestro tiempo. López Vives v. Policía de Puerto Rico, ante, a las págs. 226-27. Véase, además, los casos allí citados. (nota al calce omitida y énfasis suplido).

No obstante lo anterior y en cuanto a la situación particular de la prohibición del discrimen por condición social, Trías Monge advierte que en la redacción de nuestra disposición análoga "[h]ubo omisiones significativas, no obstante" al compararlo con el texto inspirador, pues el segundo Artículo de la Declaración, *ante*, dispone, en lo pertinente, que:

Toda persona tiene todos los derechos y libertades proclamadas en esta Declaración, sin distinción alguna de raza, color, sexo, idioma, religión, opinión política o de cualquier otra índole, origen nacional o social, posición económica, nacimiento o cualquier otra condición. Artículo II de la Declaración Universal de Derechos del Hombre en José Trías Monge, Historia Constitucional de Puerto Rico, Vol. III, Editorial de la Universidad de Puerto Rico, 1982, págs. 173-75 y 243-50.

Al compararlo con nuestra disposición constitucional, podemos observar, entre otras omisiones, que nuestros Constituyentes prefirieron no incluir en nuestra Constitución una protección de derechos tan laxa que abarcara "cualquier otra condición" posible, como lo hace el Artículo segundo de la Declaración Universal de

Derechos del Hombre.[9] Optaron nuestros Constituyentes, en cambio, por incorporar en el texto constitucional el término "condición", pero uniéndolo al término "social", limitando así la protección a aquellas condiciones de índole social y económico,[10] en exclusión de otras como, por ejemplo, el estado civil de las personas. Así, en Pérez Vega v. Procurador, 148 D.P.R. 201 (1999),

---

[9] Así, por ejemplo, en la jurisdicción española, al igual que la sección primera de nuestra Carta de Derechos, el Artículo 14 de la vigente Constitución española de 1978 fue inspirado por las mismas disposiciones de la Declaración Universal de los Derechos del Hombre. Suárez Pertierra y Fernando Amérigo, Comentarios a la Constitución Española de 1978, Tomo II, Editoriales de Derecho Reunidas, 1997, pág. 260. Sin embargo, la redacción preferida por el legislador constitucional español fue la siguiente:

> Los españoles son iguales ante la Ley, sin que pueda prevalecer discriminación alguna por razón de nacimiento, raza, sexo, religión, opinión o cualquier otra condición o circunstancia personal o social"

El efecto directo de esta redacción —evidentemente más amplia que la del artículo equivalente en nuestra Constitución— ha sido el reconocimiento por parte del Tribunal Constitucional español de la inconstitucionalidad de varias prácticas discriminatorias no enumeradas en el texto constitucional y de naturalezas diversas que en ocasiones exceden el ámbito de lo social: discrimen por edad (STC 69/1991 FJ 4°) idioma (STC 195/1989 FJ 4°), matrimonio (STC 45/89, FJ 7°), divorcio o separación conyugal (STC 159/1989 FJ 5°), y las uniones de hecho (STC 184/1990 y 222/1992, FJ 6°), entre otros. Francisco Rubio Llorente, Derechos fundamentales y principios constitucionales, Editorial Ariel, Barcelona, 1995, págs. 135-138. Véase también Miguel Rodríguez-Piñero y María Fernanda Fernández López, Igualdad y discriminación, Editorial Tecnos, Madrid, 1986, págs. 232-233.

[10] Véase nota al calce núm. 7.

concluimos "que la clasificación entre parejas casadas y no casadas no guarda relación con el discrimen por 'origen o condición social' según el contexto constitucional", *Ibíd*., a la pág. 215. En ese caso, y al considerar los hechos particulares del mismo, indicamos que:

> [l]os apelantes no especifica[ro]n de qué manera particular el Art. 131 del Código Civil, supra, discrimina en su contra por 'origen o condición social´ ni [hicieron] una exégesis aceptable de la disposición constitucional para demostrar que el requisito jurisdiccional de estar casados para poder adoptar conjuntamente constituye discrimen por condición social. *Ibíd*., a las págs. 214-15. (énfasis suplido).

### B.

Gran parte del análisis antes expuesto ya ha sido objeto de estudio por parte de algunos miembros de este Tribunal en varias Opiniones particulares, en su mayoría concurrentes. Como veremos más adelante, surge de las Opiniones mayoritarias emitidas en estos casos, en que algunos de nuestros compañeros Jueces emitieron sus Votos particulares, que optamos en ellos por no recorrer la vía constitucional para resolver las controversias planteadas por entender que existían otras vías interpretativas igualmente válidas cuya utilización debía preferirse. Véase: P.P.D. v. Admor. General de Elecciones y demás casos, ante. Ello no implica, sin embargo, que lo expresado por algunos miembros de esta Curia en sus Votos particulares con el propósito de abonar al entendimiento del enigmático concepto "condición social", carezca de

validez y no pueda ser utilizado como fuente de
ilustración.[11]

El primer asomo del término "condición social" en la
jurisprudencia puertorriqueña surgió en ocasión de la Opinión
emitida en <u>Pueblo</u> v. <u>Caro González</u>, 110 D.P.R. 518 (1980). Al
emitir su Voto concurrente, en cuanto a cierta controversia
sobre los elementos constitutivos del delito de Alteración a
la Paz, Art. 260 del Código Penal de Puerto Rico de 1974, 33
L.P.R.A. secc. 4521, el entonces Juez Asociado señor Díaz Cruz
se expresó de la siguiente manera:

> <u>La universalidad de la dignidad humana, es</u>
> <u>como la libertad, valoración primordial de la</u>
> <u>sociedad democrática, y se reafirma en nuestra</u>
> <u>Constitución mediante una prohibición expresa</u>
> <u>contra la discriminación en el disfrute de los</u>
> <u>derechos fundamentales sobre la base de raza,</u>
> <u>color, sexo, nacimiento, origen o condición</u>
> <u>social, ideas políticas o religiosas.</u>
>
> . . . Todos los hombres son iguales bajo la
> ley y en Puerto Rico, por expresión afirmativa
> de nuestra Constitución, la dignidad de todo ser
> humano es inviolable. Art. II, Sec. 1. Esta
> disposición recoge un fundamental principio de
> moral que ni se afecta ni se diluye porque la
> persona, hombre o mujer, pertenezca a la
> Policía. El Derecho penal rige y se aplica con

---

[11] Descartamos de esta manera la interpretación de los
casos citados hecha por el Procurador General en su
alegato. El sólo hecho de que este Tribunal no haya
resuelto los mismos desde la perspectiva de la prohibición
constitucional contra el discrimen por "origen o condición
social" <u>no quiere decir necesariamente</u> que ello deba
interpretarse, según sostiene el Procurador, como una
expresión nuestra a los efectos de limitar el alcance del
término "origen o condición social" al "origen de clase o
el estatus económico de una persona", en exclusión de
otras modalidades de discrimen del mismo género.

absoluta universalidad, sin licencia para el infractor predicada en la <u>condición social,</u> <u>naturaleza del trabajo, y demás conceptos en que</u> <u>se funda la abolición del discrimen en nuestro</u> <u>régimen de derecho.</u> *Ibíd*., a las págs. 533-34.(cita omitida y énfasis suplido). [12]

En el caso <u>Molina v. C.R.U.V.</u>, 114 D.P.R. 295 (1983), el ex-Juez Asociado señor Irizarry Yunqué, también mediante Opinión concurrente, relaciona los instantes en los que se abordó el término "condición social" en el seno de nuestra Convención Constituyente, para luego sugerir que la Constitución del Estado Libre Asociado de Puerto

---

[12] La controversia que se sometió ante nuestra consideración en este caso era la de determinar "si a un policía se le puede alterar la paz, según lo dispuesto por el Art. 260 del Código Penal en su inciso (a.)". <u>Pueblo v.</u> <u>Caro</u>, *ante*, pág. 519. Debemos aclarar que <u>aun cuando en</u> <u>dicho caso no juzgamos propio abordar la controversia</u> <u>desde la perspectiva puramente constitucional</u> es evidente que <u>consideraciones de esta naturaleza guiaron nuestro</u> <u>criterio</u>. Basta con citar lo expresado en el apartado cuarto de nuestra Opinión:

Al reflexionar sobre esta problemática en Puerto Rico, opinamos que la clave estriba en reconocer que la Policía se compone de individuos. No sólo se socavaría la dignidad y autoridad de dicho cargo al negarle protección contra el insulto gratuito y obsceno, <u>sino que</u> <u>se devaluarían los principios constitucionales</u> <u>que promulgan la dignidad del ser humano y la</u> <u>igual protección de las leyes</u>. La Policía es acreedora a la misma protección que otras personas. Al asumir tan importante función no renuncian a ese intangible --pero real-- elemento de honra que todos albergamos en nuestro espíritu. ¿Cómo exigirles respeto, si están sujetos al insulto y oprobio sin ninguna sanción? (énfasis suplido).

Rico, por ser de factura más ancha que la Constitución federal, prohibe el discrimen contra las personas pobres.[13]

En el caso Vega v. Luna Torres, 126 D.P.R. 370, 377 (1990), en aras de lograr mayor acceso a la justicia por parte de la población indigente y no dejar "huérfanas" a las entidades que prestan servicios legales gratuitos, resolvimos hacer inaplicable a estos programas de asistencia legal la norma general de que los honorarios por temeridad pertenecen al cliente. En su Opinión concurrente, y en perfecta armonía con la Opinión mayoritaria emitida, el hoy Juez Presidente señor Hernández Denton expresó que:

> "[N]uestra responsabilidad social y judicial requiere que al amparo de nuestros poderes constitucionales desarrollemos medios creativos y efectivos para garantizarle ayuda legal a los indigentes. La concesión de honorarios de abogado a los distintos programas de asistencia legal constituye un mecanismo valioso para lograr este objetivo. Así

---

[13] Valga señalar que en nuestra Opinión mayoritaria en Molina v. C.R.U.V., ante, descartamos la vía constitucional en la solución de la controversia del caso por entender que "no [tuvimos] que considerar la impugnación de las recurrentes de la validez constitucional de la aplicación a su caso del requisito de fianza, pues la interpretación del estatuto permite atender adecuadamente sus planteamientos." Ibid, pág. 297. Véase, además, Reyes v. Oriental Federal Savings Bank, 133 D.P.R. 15 (1993). En estos casos fuimos enfáticos al señalar que la imposición del pago de la fianza contemplada en la Regla 69.5 de Procedimiento Civil no viola la garantía constitucional de igualdad ante la ley ni la prohibición contra el discrimen por condición social ya que los litigantes indigentes no vienen obligados a prestar este tipo de fianza siempre que demuestren que su razón de pedir puede tener méritos. Molina v. C.R.U.V. y Reyes v. Oriental, ante.

contribuimos a la noble causa de estimular la participación más activa de la clase togada en la defensa de los derechos de los grupos marginados, <u>garantizamos la igualdad de los hombres ante la ley y evitamos el discrimen por origen o condición social vedado por nuestra Constitución</u>". *Ibid*, a las págs. 381-82. (énfasis suplido).[14]

C.

Aclarado el alcance de la expresión "condición social" en nuestra jurisdicción, nos corresponde determinar si el hecho de ser ex-presidiario constituye una "condición" de esta categoría dentro del contexto constitucional antes reseñado.

En la vigésimasegunda edición del Diccionario de la Lengua Española de la Real Academia Española (2001), se define el término "social" como lo "perteneciente o

---

[14] Otro ejemplo es el caso <u>Berberena</u> v. <u>Echegoyen</u>, 128 D.P.R. 864, 914 (1991) en el que se pretendió impugnar la constitucionalidad de la Sección 6 de la Ley Núm. 25 de 3 de junio de 1960 que disponía que todo maestro en servicio activo del antes denominado Departamento de Instrucción Pública que fuese candidato oficial a un cargo electivo en Puerto Rico, sería automáticamente relevado de sus funciones docentes y tendría derecho a una licencia especial con sueldo hasta un día después de la celebración de las elecciones. Aunque una de las opiniones disidentes pretendía que abordáramos la controversia desde la óptica de la protección constitucional contra el discrimen por condición social, sostuvimos en ese momento que el estatuto impugnado <u>no violaba la cláusula constitucional de igual protección de las leyes por tratarse de un esquema de incentivos gubernamentales para facilitar el acceso a los maestros al ruedo político que no restringía el acceso de otra clase de candidatos al mismo</u>. Entendimos también que dicha medida <u>se justificaba porque lograba evitar "que un maestro tenga que trabajar al aspirar a cargos electivos" y "la contaminación del Sistema de Educación Pública con la política partidista"</u>. <u>Berberena</u> v. <u>Echegoyen</u>, ante, a la pág. 881.

relativo a la sociedad" y se define a su vez "sociedad" como la "reunión mayor o menor de personas, familias, pueblos o naciones" o "agrupación natural o pactada de personas, que constituyen unidad distinta de cada uno de sus individuos, con el fin de cumplir, mediante la mutua cooperación, todos o alguno de los fines de la vida". Otra fuente por su parte indica, al definir el mismo concepto, que "afecta lo social a todo individuo que por circunstancias personales, familiares, raciales, profesionales, o de otra índole integra un grupo definido". Guillermo Cabanellas, _Diccionario Enciclopédico de Derecho Usual_, 23 Ed., Tomo II, Editorial Heliasta, 1994, pág. 466. (énfasis suplido).

No debe existir duda de que la "sociedad" a la que se hace referencia en nuestro texto constitucional con la expresión "condición social" es la sociedad jurídica que este mismo texto ampara: la sociedad puertorriqueña. Tampoco hay duda de que forman parte de nuestra sociedad todos los puertorriqueños y puertorriqueñas y todas las personas sujetas a las leyes de Puerto Rico.[15] Corolario de ello es que también forman parte de esta sociedad aquellos

---

[15] "No importa la extracción de la persona, su condición en la comunidad, todos los puertorriqueños y todas las personas sujetas a las leyes de Puerto Rico son iguales antes nuestras leyes". _Diario de Sesiones de la Convención Constituyente_, ante, a la pág. 1382.

ex-presidiarios, y ex-presidiarias, sujetos a las leyes de nuestro País.

Por otra parte, el Diccionario de la Real Academia Española, *ante*, define "condición" como "índole, naturaleza o propiedad de las cosas", "estado, situación especial en que se halla alguien o algo" y "calidad del nacimiento o estado que se reconocía en los hombres; como el de noble, el de plebeyo, el de libre, el de siervo, etc." (énfasis suplido). Dice otra fuente que condición es el "carácter o clase de las personas, calidad del nacimiento o de posición económica (...) [y] más de lleno en el ámbito del Derecho, condición equivalente a calidad de estado o nacimiento de los hombres, en virtud de la cual tienen diferentes derechos y obligaciones". Guillermo Cabanellas, ante, a la pág. 267.[16]

---

[16] La contraposición de los términos "estado" y "nacimiento" en las definiciones del concepto "condición" a las que hemos hecho referencia no da cabida a la interpretación de la recurrente en cuanto a que las distintas manifestaciones de "condición social" sobrevienen solamente por vía del nacimiento o "situaciones sobre las cuales no se tiene control alguno". Tomemos, por ejemplo, una persona que nace en una familia de acomodada condición económica y buena estima social. Esta persona puede, en el ejercicio de su libertad de acción o por otras circunstancias, abandonar su condición social y los privilegios que ello conlleva para convertirse, digamos, en un indigente. El hecho de que esta persona se haya "mudado" de clase o condición social y no haya nacido en la clase menos privilegiada que ahora ocupa no significa que por este motivo esté menos protegido en términos constitucionales que los otros miembros de su nueva clase que sí la ocupan por nacimiento. Sería absurdo pensar lo contrario.

Habida cuenta de la definición que nuestra civilización le ha dado a los términos "condición" y "social", y tomando en consideración las fuentes jurídicas antes citadas, procede que definamos el término "condición social", tal y como aparece en nuestro texto constitucional, como aquella "situación o estado especial" en que se encuentran los miembros de un grupo específico de nuestra sociedad, que por motivo de sus características en común y por tratarse de un sector tradicionalmente estigmatizado, son objeto de marginación y trato diferencial. Esto es, para que una clasificación basada en la condición social de la persona esté proscrita desde el punto de vista constitucional, es necesario que la misma sea producto de una marcada y constatable tendencia social a relegar a quienes presenten dicha condición.

No cabe duda que en Puerto Rico, los ex-presidiarios y ex-presidiarias, por su "situación o estado especial", constituyen un grupo específico dentro de nuestra sociedad. Tampoco albergamos duda alguna de que en nuestro País, este grupo históricamente ha sido relegado y estigmatizado por los demás sectores sociales. En ese sentido, no debemos ignorar el hecho de que en nuestra sociedad, cuando a una persona se le condena públicamente por haber cometido un delito, se le impone también un estigma social que, en la mayoría de las ocasiones, nunca desaparece, aun cuando la condena ha sido cumplida. Lo anterior es un perfecto ejemplo de lo que nuestros

Constituyentes, en su esfuerzo por crear una Constitución de "factura más ancha" que la Constitución federal, denominaron "condición social".

Como vemos, un análisis detenido y sosegado del asunto ante nuestra consideración, nos lleva inexorablemente a concluir que la condición de ex-convicto es un tipo de condición social protegido por nuestra Constitución. No hacerlo equivaldría a negar que tradicionalmente en Puerto Rico, se ha marcado a los ex-convictos con el "carimbo de la potencial reincidencia" y se les ha marginado de múltiples facetas de la sociedad --la laboral, por ejemplo--, a pesar de haber pagado su deuda con la comunidad.[17] Al así concluir, garantizamos la vigorosidad y relevancia de nuestra Carta de Derechos frente a los problemas socioeconómicos y políticos de nuestros tiempos. López Vives v. Policía de Puerto Rico, ante.

Para conocer la vigencia de la situación a la que se exponen los ex-convictos, basta con mencionar los hechos

---

[17] Cabe mencionar que la sección 19 del Art. VI de nuestra Constitución dispone, en lo pertinente, que "será política pública del Estado Libre Asociado [...] propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social". Véase Diario de Sesiones, ante, Tomo 3, págs. 2132-33 y 2142-44. Véanse también Serrano Vélez v. E.L.A., res. el 18 de junio de 2001, 2001 T.S.P.R. 92; In re Colón Fontán, res. el 18 de junio de 2001, 2001 T.S.P.R. 91; A.E.E. v. U.T.I.E.R., res. el 21 de mayo de 2001, 2001 T.S.P.R. 37; y Pueblo ex rel N.I.R.M., 111 D.P.R. 640 (1981).

del caso de autos: El señor Rosario Díaz cometió su delito a la edad de 21 años, siendo aún joven y, seguramente, inmaduro; fue convicto y cumplió en su totalidad la pena impuesta; no ha vuelto a tener problemas nuevamente con la justicia; contrajo matrimonio; y ha procreado, junto a su señora esposa, dos hijas. A pesar de esto, se le negó empleo, no necesariamente porque sus convicciones previas y sus circunstancias particulares le inhabilitaran para el puesto solicitado, sino porque allí donde solicitó empleo es política institucional que nadie con convicciones criminales previas debe tener acceso a un trabajo.

Tan clara es esta política para el patrono que denegó la contratación de Rosario Díaz, que su coordinador de recursos humanos no tuvo ningún reparo en admitir que su compañía "mantiene una política de no reclutar o emplear a personas con antecedentes penales". Lo más significativo --y ciertamente un factor que no tomó en consideración la Toyota al considerar la solicitud de empleo de Rosario Díaz-- es el hecho de que los veinte años transcurridos, entre la comisión de los delitos y la entrevista de empleo, sin que Rosario Díaz tuviera nuevos problemas con la justicia, dan fe de su completa rehabilitación.

Ciertamente, los argumentos presentados en este caso permitieron la realización de una exégesis aceptable de nuestra disposición constitucional que prohíbe el discrimen por condición social. Habiendo concluido que el

haber sido convicto de algún delito es un "tipo de condición social", resulta lógico que aquellas personas marcadas por dicha condición deben gozar de las protecciones constitucionales y estatutarias debidas. Es por esto que concluimos que el discrimen por convicciones criminales previas, por ser una modalidad de discrimen por condición social, está prohibido en nuestra jurisdicción por la Sección Primera, Art. II de nuestra Constitución (frente al Estado) y por las disposiciones afines contenidas en nuestras leyes anti-discrimen (frente a entes privados).[18]

---

[18] Resulta pertinente, y de fundamental importancia, señalar lo expresado por este Tribunal en Amy v. Adm. Deporte Hípico, 116 D.P.R. 415, 421-22 (1985). Allí indicamos que:

> El derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio inalienable al hombre, preexistente a la más antigua de las constituciones conocidas. El destino incierto de la frustrada Sec. 20 de nuestra Constitución, late entre aquellos derechos que aunque no se mencionan expresamente en el texto, el pueblo se reserva frente al poder político creado. (. . .)

> En efecto, la Convención Constituyente tuvo muy presente expandir el alcance del concepto 'vida' como derecho inalienable del hombre. Uno de sus ilustres delegados, expresó en aquella ocasión la siguiente visión:

> . . . La palabra 'vida' contiene toda una serie de derechos aparte del de la simple respiración, que no están incluidos necesariamente en la palabra 'libertad' ni en la palabra 'propiedad'. O sea, de eliminarse la palabra 'vida' de esta frase tan consagrada en la historia de este gran derecho, se estaría haciendo un cambio fundamental en cuanto [a

(Continúa . . .)

D.

No podemos terminar sin hacer un <u>importante señalamiento</u> adicional. En <u>Díaz</u> v. <u>Wyndham Hotel Corp.</u>, res. el 24 de octubre de 2001, 2001 T.S.P.R. 141, a propósito de la antes citada Ley 100 anti-discrimen, expresamos:

> Al interpretar el alcance de la Ley Núm. 100, deben tomarse en consideración los valores sociales y económicos recogidos en la legislación laboral; esto es, proteger a la masa trabajadora contra el discrimen en el empleo y en el reclutamiento, interpretando siempre tales estatutos de la manera más favorable al empleado víctima de actuaciones discriminatorias e injustificadas. <u>Ello no significa, sin embargo, que no se tenga que realizar un adecuado balance entre tal protección a los empleados y el valor e interés patronal, también protegido, de velar por las prerrogativas gerenciales que el sistema económico le reconoce a éste último.</u> *Ibíd*. (énfasis suplido).

-------------------------

eso], principalmente ahora que se está expandiendo el área de los derechos humanos y ahora que se está reconociendo una segunda carta de derechos a la anterior clásica, tipo siglo XVII, y se están significando como derechos del hombre también en este documento, el derecho a la educación, <u>el derecho al trabajo</u>, el derecho a un nivel adecuado de vida. (citas y nota al calce omitidas y énfasis suplido).

El discrimen del cual fue objeto el señor Rosario Díaz --y que seguramente padecen muchos ex-convictos en nuestra sociedad a diario--, por ser del tipo laboral, lastima no sólo el derecho que ampara a este grupo de personas de no ser discriminadas por su condición especial sino que lastima también su derecho al trabajo y a gozar de un nivel adecuado de vida. Véase, además, <u>Hernández Cruz</u> v. <u>Sria. de Instrucción</u>, 117 D.P.R. 606, 615 (1986); <u>Arroyo</u> v. <u>Rattan Specialties, Inc.</u>, 117 D.P.R. 35 (1986); <u>Ortiz Cruz</u> v. <u>Junta Hípica</u>, 101 D.P.R. 791 (1973).

Con este "adecuado balance" en mente, nuestro legislador proveyó un esquema de presunciones y cargas de prueba para las reclamaciones laborales amparadas en la Ley 100, ante.[19] Para activar la presunción de discrimen el empleado tiene que probar tres elementos: (1) que hubo un despido o acción perjudicial; (2) que éste se realizó sin justa causa; (3) presentar evidencia indicativa de la modalidad de discrimen que se vincula al despido.  Es en ese momento que se activa la presunción. Díaz v. Wyndham Hotel, ante; Hernández v. Trans Oceanic Life Insurance Co., 2000 T.S.P.R. 115; Belk Arce v. Martínez, 146 D.P.R. 215 (1998). A esos efectos, hemos dicho que "ciertamente, estas circunstancias o hechos básicos varían dependiendo del contexto en que se dé la decisión de empleo y a base del tipo o modalidad que se esté alegando". Véase: Díaz v. Wyndham, ante.

En Alberty Marrero v. B.G.F., 149 D.P.R. 655 (1999), expresamos que:

> "Separar, distinguir, diferenciar una cosa de otra. ... Dar trato de inferioridad a una persona o colectividad por motivos raciales, religiosos, políticos, etc.", este es el significado que la sociedad le atribuye a la acción de discriminar. Por ello, es la sociedad quien, de ordinario, establece los parámetros aceptados para discriminar. Las normas sociales establecen cuándo y sobre cuáles asuntos los juicios valorativos de los individuos son inaceptables, impartiéndole así atributos negativos a la discriminación. No empece a ello, no todo lo que socialmente se considera como discrimen tiene un resultado análogo en el campo

---

[19] Véase la nota al calce núm. 5.

del Derecho. *Ibíd*., a las págs. 661-62. (nota al calce omitida y énfasis suplido).

En este mismo caso, ante la controversia que allí se nos presentó sobre discrimen político, reiteramos que:

> El Art. 3 de la Ley Núm. 100, ante, 29 L.P.R.A. sec. 148, establece una presunción rebatible de que el despido es discriminatorio salvo que se demuestre que hubo justa causa. La presunción se activa al demostrarse que el patrono no tenía justa causa para tomar la acción en controversia. [...] Llegado el momento en que se activa la presunción de discrimen que establece la ley, el demandado tiene varias opciones o alternativas. Como es sabido, desde el ámbito de Derecho Probatorio, el demandado puede atacar o destruir la presunción en tres (3) formas distintas, a saber: derrotar el hecho básico, esto es, la alegación de que no hubo justa causa; destruir el hecho presumido, esto es, la alegación de que el despido se debió a discrimen político; y, la última opción, atacar o destruir ambos hechos, el básico y el presumido. *Ibíd*., a las págs. 663-664. (nota al calce omitida y énfasis suplido).

Reconocimos, además, en Alberty Marrero v. B.G.F., ante, que para los casos de discrimen en el servicio público en particular, el demandado tiene una cuarta opción o defensa: aceptar que discriminó políticamente pero que fue porque, para el puesto en cuestión, es esencial la identidad en afiliación política entre el empleado y la autoridad nominadora para el cabal desempeño de las funciones del cargo. *Ibíd*., a la pág. 664 n. 14. De esta manera, logramos crear un balance entre los derechos del empleado y los intereses del Gobierno como patrono y promotor de la política pública estatal.

En aras de mantener, en el caso que hoy ocupa nuestra atención, el "adecuado balance" entre los intereses de los empleados y los patronales entendemos prudente que debe obrarse de la misma manera que lo hicimos en Alberty Marrero v. B.G.F., ante. Esto es, entendemos que en casos como el de autos, el patrono debe tener la opción de poder discriminar "legítimamente" contra el solicitante de empleo cuando las circunstancias particulares del caso así lo aconsejen. Precisamente, este es el tratamiento que varias jurisdicciones estatales le han dado al enfrentarse a este tipo de controversia. Veamos, a manera de ilustración, algunos ejemplos:

Al año 2000, seis estados de los Estados Unidos de América contaban con disposiciones legales vigentes que de una manera u otra prohibían el discrimen por convicciones criminales previas en el empleo: Hawaii, Wisconsin, Nueva York, Massachussets, Connecticut y Minnesota. S.L. Lau, Employment Discrimination Because of One's Arrest and Court Record in Hawaii, 22 U. Haw. L. Rev. 709 (2000).[20] Valga señalar que la protección provista en estos estatutos no es ilimitada. Tres de ellos, por ejemplo, enumeran ciertos factores que deben ser considerados por

---

[20] Véanse: Hawaii Revised Statutes Annotated, sec. 378-2 (1); Wisconsin Annotated Statutes, sec. 111.31; New York Consolidated Law Service, secs. 752 y 753; Annotated Laws of Massachusetts, capítulo 151.B., sec. 4(9); Connecticut Annotated Statutes, secc. 46.a-80; Minnesota Annotated Statutes, sec. 364.03.

el patrono al momento de la contratación de un ex-convicto. Estos factores guían el criterio del patrono y, según las circunstancias de cada caso, <u>podrían, incluso, justificar un acto discriminatorio de su parte basado en las convicciones previas del solicitante</u>. Ausente esta justificación por vía de excepción, cualquier práctica discriminatoria por convicciones criminales previas sería improcedente bajo dichos estatutos.[21] Dichos factores son, en resumen, los siguientes:

1. la <u>naturaleza y gravedad</u> del delito cometido;
2. la <u>relación</u> entre el delito cometido, el empleo solicitado, y los requisitos y responsabilidades que el trabajo conlleva;
3. el <u>grado de rehabilitación</u> del solicitante y cualquier información que el solicitante o un tercero pueda legítimamente brindar al respecto;
4. las <u>circunstancias</u> bajo las cuales se cometió el delito, incluyendo circunstancias atenuantes o particulares existentes al momento de la comisión del mismo;
5. la <u>edad</u> del solicitante al cometer el delito;
6. el <u>tiempo transcurrido</u> entre la convicción y la solicitud de empleo;
7. el <u>interés legítimo</u> del patrono en proteger la propiedad, la seguridad y bienestar propio, de terceros o del público en general.

Teniendo en mente el "adecuado balance" al que ya hemos hecho referencia, y al considerar la pertinencia de los factores antes mencionados, estamos convencidos del

---

[21] Véanse los estatutos antes citados de Minnesota y Connecticut y, en particular, la sección 753 del estatuto de Nueva York, ante, que enumera los factores que deben ser tomados en cuenta al considerar la solicitud de empleo de un ex-convicto.

hecho de que, <u>reconocer la protección estatutaria y constitucional contra el discrimen por convicciones criminales previas, como una modalidad del discrimen por condición social, sin ulteriores explicaciones ni limitaciones, sería un acto irresponsable de nuestra parte</u>.

Si bien es cierto que nuestros Constituyentes consagraron la política de la rehabilitación del confinado como un valor fundamental de nuestra sociedad,[22] no es menos cierto que nuestra Constitución alberga también <u>otros valores e intereses</u>, a veces de mayor jerarquía, como por ejemplo, la seguridad pública; el bienestar de la niñez y de otras poblaciones igualmente vulnerables; la erradicación y prevención del crimen; y la protección de los intereses propietarios y libertarios de nuestros ciudadanos. <u>A fin de cuentas, uno de los valores que nutre la política de rehabilitación en Puerto Rico es, precisamente, la protección de la sociedad.</u>[23]

───────────────

[22] Véase la nota al calce núm. 17.

[23] Sobre este tema se expresó el señor delegado Ydelfonso Solá Morales en el 54to. día de sesión de nuestra Convención Constituyente de la siguiente manera:

"Considero yo, señor Presidente y compañeros delegados, que hay que suplir, hay que poner algo en esta constitución en donde [podamos] además ofrecerle [a la sociedad] --no a los reclusos, porque no es a los delincuentes y a los reclusos, es a la sociedad en que ellos van a convivir después-- un margen de garantía y seguridad de reforma de estos delincuentes. Creo que tenemos esa deuda con la sociedad y

(**Continúa . . .**)

Concluimos, pues, que la protección constitucional y estatutaria que existe en Puerto Rico contra el discrimen laboral por convicciones criminales previas no es ilimitada. Al ponderar las solicitudes de empleo de ex-convictos, los patronos deberán tener en cuenta, entre otros factores, aquellos anteriormente señalados, a saber: (1) la naturaleza y gravedad del delito cometido; (2) la relación entre el delito cometido, el empleo solicitado, y los requisitos y responsabilidades que el trabajo conlleva; (3) el grado de rehabilitación del solicitante y cualquier información que el solicitante o un tercero pueda legítimamente brindar al respecto; (4) las circunstancias bajo las cuales se cometió el delito, incluyendo circunstancias atenuantes o particulares existentes al momento de la comisión del mismo; (5) la edad del solicitante al cometer el delito; (6) el tiempo transcurrido entre la convicción y la solicitud de empleo; y (7) el interés legítimo del patrono en proteger la propiedad, la seguridad y bienestar propio, de terceros o del público en general.

---

creo que a nombre de la sociedad debemos consignar aquí la forma en que miramos y enfocamos el problema ahora, y, a nombre de esa sociedad procurar llegar al logro de devolverle a la sociedad, si es posible, por cada delincuente, una persona regenerada y útil en el seno de esa sociedad en que va a convivir. Es con la sociedad nuestra deuda...". Diario de Sesiones de la Convención Constituyente de Puerto Rico, Ed. 1961, Tomo 3, pág. 2145.

Estos elementos <u>podrán</u> ser utilizados por el patrono al ponderar su decisión de conceder o denegar empleo, a un solicitante ex-convicto. <u>El patrono sólo podrá discriminar legítimamente contra el solicitante por razón de sus convicciones previas cuando, al sopesar los elementos antes mencionados, y bajo un criterio de razonabilidad, entienda que la previa convicción le descalifica para ocupar el puesto.</u>

Los elementos o factores mencionados estarán también a la disposición del patrono como una "cuarta vía" para <u>derrotar</u> la presunción de discrimen del Art. 3 de la Ley 100, supra, <u>de manera similar a como ocurre en los casos de discrimen político en la función pública.</u> Véase: <u>Alberty Marrero</u> v. <u>B.G.F.,</u> ante. Es decir, ante una alegación de discrimen por convicciones previas, el patrono demandado podrá, <u>como defensa</u>, aceptar que discriminó contra el solicitante pero que su acto se justifica, <u>cuando se toma en consideración el riesgo excesivo a los que razonablemente se exponen los intereses del patrono o de la comunidad con la posible contratación del ex-convicto, una vez sopesados todos los elementos.</u>[24]

---

[24] Al aplicar el criterio de razonabilidad que hoy establecemos, evitamos dejar al descubierto la genuina preocupación de la peticionaria Toyota en cuanto a la responsabilidad vicaria del patrono por las acciones u omisiones negligentes de sus empleados.

IV

Concluida la primera controversia planteada ante nos, resulta más sencilla de resolver la segunda; esto es, qué remedios o derechos, si alguno, tienen a su disposición las partes en este caso.

Considerados los hechos de este caso y el derecho aplicable, entendemos que Rosario Díaz tiene contra la Toyota de Puerto Rico una causa de acción basada en la prohibición constitucional y estatutaria del discrimen laboral por condición social, en su modalidad de discrimen por convicciones criminales previas. En consecuencia, concluimos que el Tribunal de Primera Instancia erró al desestimar la demanda incoada y privar al señor Rosario Díaz de "su día en corte". Véase: Alberty Marrero v. B.G.F., ante, a las págs. 655-56. Una vez retorne el caso al tribunal de instancia, las partes promoverán sus respectivas contenciones de conformidad con lo establecido en la presente Opinión y en las normas procesales y evidenciarias aplicables en casos de alegado discrimen laboral.

Con respecto a los argumentos de la parte recurrida sobre la constitucionalidad de la Ley de Antecedentes Penales, ante, coincidimos con el foro apelativo intermedio en cuanto a que el reclamo que hicieran los esposos Rosario-Fontánez en su demanda ante el Tribunal de Primera Instancia es a los efectos de cuestionar el uso dicriminatorio que le diera la Toyota a la información

contenida en el Certificado de Antecedentes Penales de Rosario Díaz y no a los efectos de cuestionar la potestad de la peticionaria para requerir dicho documento o el carácter público que la Ley le confiere al mismo. Resuelta la controversia del caso de autos por otros fundamentos, y habiendo armonizado en la presente los criterios de las partes lo más equitativamente posible, <u>no entramos a considerar la constitucionalidad de la Ley impugnada</u>. Véase: <u>Domínguez</u> v. <u>Maldonado</u>, ante.

Por los fundamentos expuestos es que suscribimos la Sentencia emitida, confirmatoria la misma de la emitida en el presente caso por el Tribunal de Apelaciones.

FRANCISCO REBOLLO LÓPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wilfredo Rosario Díaz,
Ruth Fontánez Alicea, Etc.

   Demandantes-Recurridos

       vs.                     CC-2002-825
Certiorari

Toyota de Puerto Rico, Corp.
Sec. de Justicia del E.L.A. de
P.R. y Otros

   Demandados-Peticionarios

Opinión disidente emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI, a la que se unen el Juez Presidente señor Hernández Denton y la Juez Asociada señora Rodríguez Rodríguez.

San Juan, Puerto Rico, a 24 de octubre de 2005.

El caso de autos presenta la cuestión de si la acción de una empresa privada, de retirar una oferta de empleo que ésta le había extendido antes a un **ex-convicto**, constituye un **discrimen por condición social** prohibido por la Constitución del Estado Libre Asociado de Puerto Rico.

I

En 1976, Wilfredo Rosario Díaz (en adelante "Rosario") se declaró culpable de cometer los delitos de homicidio y de violación a la Ley de Armas y fue condenado a cumplir una pena de seis años y seis meses de prisión, al amparo del beneficio de una sentencia suspendida.

Veinte años más tarde, en 1996, Rosario procuró un empleo con la empresa Toyota Corp. de Puerto Rico (en adelante "Toyota"), referido allí por el Departamento del Trabajo. Luego de las entrevistas de rigor, un supervisor de Toyota le indicó a Rosario la fecha en que comenzaría a trabajar como chofer de almacén, una vez tramitara los usuales certificados de salud y de buena conducta.

Oportunamente Rosario entregó los documentos requeridos, incluyendo un certificado de antecedentes penales que reflejaba las convicciones mencionadas antes, que Rosario infructuosamente había tratado de eliminar de su expediente penal. Fue entonces cuando el empleado de Toyota que recibió los referidos documentos le informó a Rosario que tenía que paralizar el trámite de su empleo hasta tanto se asesorara con su supervisor. Días más tarde, se le indicó a Rosario que su contratación no había obtenido el visto bueno debido a las convicciones que aparecían reflejadas en el certificado de antecedentes penales. Se le informó que era política de la compañía no emplear a personas que tenían tales antecedentes.

Por lo anterior, el 14 de marzo de 1997 Rosario, su esposa y la sociedad de bienes gananciales integrada por ambos presentaron ante el Tribunal de Primera Instancia una demanda, *inter alia*, sobre violación de derechos civiles y daños y perjuicios contra Toyota. En lo pertinente[25] alegaron

---

[25] Los demandantes impugnaron también la constitucionalidad de la Ley Núm. 254 de 27 de marzo de 1974, la cual autoriza a la Policía de Puerto Rico a expedir certificados de antecedentes penales. Ello dio lugar a la intervención del Procurador General de Puerto Rico en este pleito. Sin

que Toyota le había hecho una oferta de trabajo a Rosario, la cual fue luego retirada a consecuencia de las convicciones reflejadas en su certificado de antecedentes penales; y que tal actuación constituyó un acto de discrimen por condición social.

Toyota, a su vez, presentó una moción de desestimación mediante la cual alegó que la demanda referida no aducía una reclamación que justificara la concesión de un remedio. El 4 de junio de 2001, el foro de instancia acogió la moción aludida y desestimó la demanda de Rosario y su cónyuge.

Oportunamente los demandantes acudieron ante el entonces Tribunal de Circuito de Apelaciones. Luego de los trámites de rigor, éste emitió una sentencia el 19 de agosto de 2002 y revocó el dictamen del foro de instancia. Resolvió vagamente que al interpretar las alegaciones del demandante lo más liberalmente posible, éste "podía ser acreedor en derecho a la concesión de un remedio."

Denegada la solicitud de reconsideración de Toyota, ésta acudió ante nos y formuló el siguiente señalamiento de error:

> "Erró el Tribunal de Circuito de Apelaciones al revocar la sentencia dictada por el Tribunal de Primera Instancia y concluir que el demandante, por ser ex-convicto, es acreedor de algún remedio en ley que impide la desestimación de la demanda de discrimen por condición social".

El 13 de diciembre de 2002, expedimos el recurso de Certiorari solicitado por Toyota. Esta presentó su alegato el

---

embargo, ni el foro de instancia ni el foro apelativo consideraron este planteamiento, por lo que nosotros atendemos aquí sólo el asunto medular ante nos.

8 de abril de 2003, y luego de una prórroga, la parte recurrida presentó el suyo el 12 de julio de ese año.

## II

La Sección I del Art. II de la Constitución del Estado Libre Asociado dispone, en lo pertinente aquí, que

> "No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o **condición social**, ni ideas políticas o religiosas".

Las ocho categorías de discrimen prohibidas por esta fundamental disposición constitucional constituyen las vertientes particulares del principio de esencial igualdad humana, que es uno de los pilares sobre los que se erige nuestra Carta de Derechos. Las ocho categorías aluden a diferencias manifiestas que se dan entre los seres humanos pero que ante los ojos del Derecho son como si no existieran porque todas las personas se consideran iguales ante la Ley.

En la Convención Constituyente, en el Informe de la Comisión de Carta de Derechos, se señaló claramente la finalidad de esta disposición cardinal:

> **El propósito de esta sección es fijar claramente como base consustancial de todo lo que sigue el principio de la dignidad del ser humano y, como consecuencia de ésta, la igualdad esencial de todas las personas dentro de nuestro sistema constitucional. La igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura. Todo discrimen o privilegio contrario a esta esencial igualdad repugna al sistema jurídico puertorriqueño.**

**4 Diario de Sesiones de la Convención Constituyente 2561, Equity (1961).**

En numerosas ocasiones hemos tenido la oportunidad de interpretar y dilucidar el significado y alcance de casi todas de estas ocho categorías constitutivas del principio de esencial igualdad humana. La que nos concierne aquí ahora, sin embargo, es una categoría que hemos examinado muy poco.

En efecto, la única y reducida consideración de la categoría de discrimen por condición social la realizamos en <u>Pérez, Román v. Procurador Especial de Relaciones de Familia</u>, 148 D.P.R. 201, 213-215 (1999). Allí rechazamos que el requisito del Art. 131 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 532, de que los que integran una pareja deben estar casados entre sí para poder adoptar, constituyese un discrimen por condición social. Señalamos que **"la clasificación entre parejas casadas y no casadas no guarda relación con el discrimen por "origen o condición social"**, Id. a la pág. 215; y afirmamos que la categoría en cuestión se refería a **"discrímenes económicos y sociales, y no a distinciones razonables que puedan surgir por el estado civil de las personas"**, id. a la pág. 214.

La categoría de discrimen por condición social tampoco tiene un extenso historial constitucional; pero no es un concepto jurídico enigmático o inescrutable. Veamos.

III

En la Convención Constituyente de Puerto Rico hubo una breve discusión en torno a lo que es ahora la Sec. 1, Art. II de nuestra Constitución, en la que se aludió expresamente al

contenido de la categoría "condición social" de dicha disposición. Esa discusión ocurrió en una de las últimas sesiones de la Constituyente, cuando se debatía el planteamiento del delegado Gutiérrez Franqui de eliminar la categoría **<u>posición económica</u>** de la propuesta sobre dicha disposición constitucional. El delegado Reyes Delgado expresó en ese momento su preocupación con respecto a la referida recomendación de Gutiérrez Franqui, pero dicha preocupación quedó atendida luego, por entenderse que lo relativo a **<u>posición económica</u>** estaba comprendido en el concepto más amplio de **<u>condición social</u>**. Así lo afirmó expresamente el delegado González Blanes quien señaló entonces lo siguiente:

> Sr. González Blanes. . . Nos satisface la eliminación de "posición económica", porque entiendo que ahí está incluida la dificultad que levanta el compañero Reyes Delgado al ponerse más adelante "o condición social" . . .

*3 Diario de Sesiones de la Convención Constituyente de Puerto Rico* 2245, Equity (1961).

De lo anterior es evidente que el discrimen por condición social incluye claramente el discrimen por posición económica. Pero hay algo más que se conoce claramente con respecto al significado del concepto en cuestión. Para esclarecerlo es necesario referirse a un evento importante en la historia del desarrollo constitucional de Puerto Rico, muy vinculado a lo acontecido en la Convención Constituyente.

En efecto, pocos años después de celebrada esa Convención, en febrero de 1956, el Gobernador de Puerto Rico Don Luis Muñoz Marín creó el **<u>Comité para el Estudio de los</u>**

**Derechos Civiles en Puerto Rico**, a fin de examinar a fondo la vigencia real de los derechos humamos en Puerto Rico. Debe recordarse que los que formularon la Carta de Derechos en la Convención Constituyente estaban concientes de que existía una distancia notable entre los derechos declarados en ésta y el estado real de su disfrute en la isla, pero pensaban que esa distancia habría de superarse con el pasar del tiempo mediante esfuerzos concertados para lograr un mayor arraigo de esos derechos en la cultura de nuestra gente. Véase, J. Trías Monge, Historia Constitucional de Puerto Rico[26]. El referido Comité creado por Muñoz Marín a principios de 1956 fue uno de esos esfuerzos. Entre los miembros y asesores de ese Comité, se encontraban varios ilustres juristas de esa época, **quienes habían sido miembros o asesores a su vez de la Convención Constituyente**, tales como Don José Trías Monge y Don Pedro Muñoz Amato. En el histórico Informe del Comité referido, que dio lugar a la creación como institución gubernamental permanente de la Comisión de Derechos Civiles de Puerto Rico, se hace referencia expresa a lo relativo a la categoría constitucional del **discrimen por condición social** y se concluye que cada día este discrimen disminuía en el país. La conclusión específica sobre el particular formulada en dicho Informe delata claramente a que se refería el discrimen por condición social. Se indicó sobre éste que:

> **"La estratificación social va perdiendo su rigidez, y así resulta más fácil ascender en la jerarquía económico-social."**

---

[26] Tomo III, pág. 169, Ed. de la U.P.R. (1982).

CC-2002-825                    8

Informe del Comité de Gobernador . . ., págs. 108-109, Ed.
Col. de Abog., Equity (1959).

La conclusión aludida estaba basada en el conocido
estudio de campo sobre la vigencia de los derechos civiles en
Puerto Rico realizado para el Comité referido por el Dr.
Edwin Seda Bonilla a través del Centro de Investigaciones
Sociales de la Universidad de Puerto Rico, en tiempo de la
rectoría de Don Jaime Benítez, quien a su vez había sido
miembro de la Convención Constituyente y presidente de la
Comisión de la Carta de Derechos de dicha Convención, y quien
facilitó la realización del estudio de Seda Bonilla. En su
informe sobre el estudio referido, Seda Bonilla alude al
discrimen por condición social, refiriéndose al concepto de
estructura social elaborado por el eminente sociólogo Ralph
Linton, que incluye la estrata "de *status* o posiciones
sociales que se interrelacionan mediante expectativas de
conducta recíproca" – **las llamadas clases sociales**. Véase,
Seda Bonilla, *Los Derechos Civiles en la Cultura
Puertorriqueña*, Editorial Universitaria, U.P.R. (1963), págs.
26-27 y 84.

En su propio estudio para el Comité, el Dr. Pedro Muñoz
Amato señaló expresamente que la categoría constitucional de
condición social se refería al *status* que tuviese la persona
humana **en la jerarquía de las relaciones económico-sociales**.
Muñoz Amato, *Informe Sobre Discrímenes Por Motivo de Raza,
Color, Sexo, Nacimiento y Condición Social*, 22 Rev. del
Colegio de Abogados de Puerto Rico, 299, 337 (1962). Este

señalamiento es de importancia decisiva ya que el Dr. Muñoz Amato puede considerarse como el asesor principal de la Convención Constituyente, habiendo sido la persona responsable por la confección de la obra *La Nueva Constitución de Puerto Rico*, que contenía los estudios preparatorios para la Convención Constituyente. Véase Id., *Ediciones de la Universidad de Puerto Rico*, 1954.

Es por todo lo anterior que el Profesor Raúl Serrano Geyls, nos dice que la categoría de condición social **"se refiere a factores económicos y sociales"**, a la situación económica y la condición social de la persona en la comunidad. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, Inst. de Ed. Práctica del Col. de Abog., (1988), pág. 1189.

En resumen, pues, con arreglo a todo lo señalado antes, en el país se conoce lo que se quiso prohibir en 1952 cuando en nuestra Constitución se proscribió el discrimen por **condición social**. La intención de los que redactaron nuestra Ley fundamental es clara. Lo que se procuró entonces fue que no se le negara a nadie la igual protección de las leyes sólo porque la persona perteneciese a determinada clase socio-económica; sobre todo se quiso que el Estado no favoreciese a determinadas personas sólo por ser éstas de la llamada clase alta, o que desfavoreciese a otros sólo por ser éstos de la llamada clase baja. Dicho de otra manera, se procuró que para los fines de la aplicación de la ley, no importase a qué clase socio-económica perteneciese la persona. Los miembros

de la Convención Constituyente entendían comúnmente que la "condición social" de una persona significaba su clase social o su posición económica, y procuraron que ésta no tuviese peso alguno jurídicamente; es decir, que no importa cuál fuese el estado o la situación socio-económica de las personas, todas son iguales ante la ley. Véase 2 *Diario de Sesiones de la Convención Constituyente* 1382, Equity (1961)(Exposición del delegado Benítez).

IV

A la luz del referido significado de la categoría de discrimen por condición social de la Sec. 1 del Art. II de nuestra Constitución, es evidente que Rosario no fue objeto de tal discrimen. El discrimen de Toyota contra Rosario por ser éste un ex-convicto, **lamentable como es**, no constituye el discrimen por condición social prohibido por la Constitución. Aplica aquí también la noción que apuntáramos antes de que *"no todo lo que socialmente se considera como discrimen tiene un resultado análogo en el campo del Derecho"*. Alberty v. Bco. Gub. de Fomento, 149 D.P.R. 655, 662 (1999).

La reclamación de Rosario aquí es inmeritoria por una segunda razón. Este sólo ha invocado la Sec. 1 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico para fundamentar su reclamo de discrimen. Al actuar de este modo ha soslayado el hecho de que Toyota es una **empresa privada**. Su actuación, por ende, no es atribuible al Estado. Para que pueda entenderse que existe un discrimen que viola las

protecciones ofrecidas por la Constitución, de ordinario debe mediar una **acción del Estado**, es decir, debe ser el Estado el alegado infractor de la garantía constitucional, o, al menos, debe el Estado estar presente de algún modo significativo en la infracción constitucional. Véase, R. Serrano Geyls, Derecho Constitucional de Estados Unidos y de Puerto Rico, 1ra ed. Inst. de Ed. Práctica del Col. de Abog., 1988, Vol. II, pág. 809. Nada de ello ha ocurrido aquí. La actuación contra Rosario fue exclusivamente de Toyota, sin que el Estado estuviese de modo alguno implicado en ella. Por ende, por esto también no tiene méritos el reclamo de Rosario al amparo de la Sec. 1 del Art. II de la Constitución de Puerto Rico.[27] Erró el foro apelativo al resolver como lo hizo.

V

Al fundamentar el aspecto más medular de nuestra opinión--de que el discrimen contra un ex-convicto no constituye la categoría constitucional del discrimen por

---

[27] Como se sabe, en Puerto Rico existe legislación que en general extiende a la contratación por patronos privados las garantías constitucionales contra el discrimen contenidas en la Sección I del Art. II de la Constitución de Puerto Rico. Se trata de la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A., Sec. 146 *et seq.*

**Rosario no ha invocado esta legislación.** De cualquier modo dicha legislación no incluye el discrimen contra un ex-convicto. En efecto, la legislación referida se aprobó también para añadirle una categoría de discrimen nueva a las ya identificadas en la Constitución, la de **discrimen por razón de edad avanzada.** Un examen cuidadoso del historial de la referida Ley 100 revela que no se contempló de modo alguno el discrimen contra ex-convictos cuando ésta o sus enmiendas fueron aprobadas. La Ley 100, pues, no incluye el discrimen sufrido por Rosario. Véase *Historial Legislativo de la Ley 100, Escrutinio Legislativo.*

condición social--en el discernible historial de la referida categoría de discrimen, hemos estado plenamente conscientes de nuestro rol como principales custodios de la Constitución. Sabemos que nos toca fortalecerla, no enervarla. Báez Cancel v. Alcalde Mun. de Guaynabo, 100 D.P.R. 982, 987 (1972). Sobre todo debemos garantizar la continuada vigencia de sus valores fundamentales frente a las nuevas realidades del país. Emp. Pur. Des., Inc. v. H.I.E. Tel., 150 D.P.R. 924, 956-958 (2000) y casos citados allí. Nuestro rol, sin embargo, no puede ser el de enmendar la Constitución por vía de una interpretación para añadirle nuevas protecciones o garantías que no fueron previstas de ningún modo por los que redactaron nuestra magna carta. **Esa prerrogativa le compete sólo al pueblo.**

En el caso de autos, Rosario nos invita a adoptar como interpretación de la categoría constitucional de discrimen por condición social la propuesta formulada por dos comentaristas en sendos artículos de revista jurídica, de que existe tal discrimen cuando se le niega la igual protección de las leyes a alguna persona por pertenecer ésta a un grupo específico dentro de nuestra comunidad que históricamente ha sido sometido a tratamiento desigual y estigmatizado socialmente [28]. Con tal interpretación, según propuesta por

---

[28] Esta particular interpretación de la categoría de "condición social" fue propuesta inicialmente por José R. Roque Velázquez en *Apuntes hacia una Definición del Discrimen por "Origen o Condición Social" en Puerto Rico,* XXVI Rev. Jur. de la Univ. Interamericana 519 (1992); y reiterada luego con señalamientos críticos por el profesor J. J. Alvarez en *Análisis del Término* 1998-99, Rev. Jur. U.P.R. 419 (2000).

los comentaristas referidos, se establecería el fundamento judicial para conjurar concretamente varios reprochables discrímenes que aun existen en nuestra convivencia comunitaria. De un solo plumazo quedarían jurídicamente proscritos, según la propuesta referida, el discrimen contra los indigentes, el discrimen contra los homosexuales, el discrimen contra los físicamente incapacitados, el discrimen contra los dementes, el discrimen contra los deambulantes, y el discrimen contra los ex-confinados. Llevada a sus extremos lógicos, el discrimen por condición social se extendería para abarcar el trato desigual con estigma social experimentado por todos los numerosos y variados grupos de personas desfavorecidas que han sido tradicionalmente objeto de burla o marginación por otros sectores de la sociedad.

Sin embargo, adoptar la referida interpretación por mero *fiat* judicial apareja varios problemas muy serios, uno de los cuales es que ésta no tiene ningún fundamento histórico que la apoye, sino todo lo contrario. Como tal, esta explayada interpretación rebasa por mucho no sólo lo que claramente se pretendió prohibir por los que redactaron nuestra Constitución, sino que rebasa incluso las implicaciones normativas para nuestra época de la intención original de ellos.

En el caso de autos, nos compete examinar únicamente la situación de los ex-convictos. Podemos afirmar con seguridad que al redactarse nuestra Constitución no hubo ni remotamente intención alguna de incluir discrímenes como el del caso de

autos en la categoría constitucional del discrimen por condición social. Nótese, en primer lugar, que según hemos señalado antes, el discrimen que se quiso prohibir mediante el mandato constitucional en cuestión es aquel que surge por motivo de **"los accidentes circunstanciales que tengan origen en la naturaleza o en la cultura"**. Se trata del discrimen por <u>**"rasgos que surgen en el ser humano por un hecho fortuito"**</u>. <u>Zachry International v. Tribunal Superior</u>, 104 D.P.R. 267, 281 (1975). El discrimen contra ex-convictos no es evidentemente del tipo configurado en la Constitución ya que no es un discrimen por un "accidente circunstancial" o por un "hecho fortuito" sino por una conducta deliberada pasada de la persona que sufre el discrimen.

Más importante aun, nótese también que la situación de los ex-convictos era claramente conocida por los miembros de la Convención Constituyente. Se aludió a ella cuando se discutió la propuesta sobre <u>**la rehabilitación de los reclusos**</u>, que finalmente se aprobó como parte de la Sección 19 del Art. VI de la Constitución [29]. A pesar de que el discrimen contra ex-convictos era evidentemente conocido por los que redactaron nuestra Ley fundamental, y a pesar, además, de ser un asunto tan particular, éste no sólo no se proscribió en su texto sino que nadie en las extensas deliberaciones de la Convención Constituyente ni siquiera mencionó que debía ser prohibido en la Constitución

---

[29] Véase 3 *Diario de Sesiones de la Convención Constituyente*, 2142-2145, Equity (1961).

propuesta, ni indicó que fuese uno de los aspectos abarcados por la categoría de condición social de ésta.

Finalmente, considerado también el carácter de las objeciones que se levantaron en la Convención Constituyente a la referida propuesta sobre la rehabilitación de los reclusos, la única intención que podría razonablemente atribuírsele a los que redactaron la Constitución con respecto al discrimen contra ex-convictos es que ellos estimaban que dicho discrimen no debía ser incluido entre los prohibidos por la propia Constitución. En la Constituyente hubo serias objeciones a la propuesta sobre la rehabilitación de los reclusos, por estimarse que era un asunto que debía ser considerado propiamente **por la Asamblea Legislativa en su día**.[30] Es evidente que tal hubiese sido el parecer con respecto al asunto de los ex-convictos, por su naturaleza controversial y contingente.

Cabe señalar aquí que en algunas jurisdicciones de Estados Unidos, en las cuales se había prohibido por estatuto que se pudiese tomar en cuenta los antecedentes penales en la contratación de empleados, se han presentado recientemente proyectos para enmendar las leyes en cuestión, para permitir ahora que los patronos puedan usar tales antecedentes como un elemento adicional en la selección de aspirantes a puestos de trabajo. Véase, T.M. Hruz, *The Unwisdom of the Wisconsin Fair Employment Act's Ban of Employment Discrimination on the*

---

[30] Véase 3 *Diario de Sesiones de la Convención Constituyente,* *2142-2145, y págs. 2115, 2132, y 2133; Equity (1961).*

*Basis of Conviction Records* [31] ; y S.S. Lau, *Employment Discrimination of One's Arrest and Court Record in Hawaii.* [32] Esta realidad sobre la naturaleza del asunto, unida al hecho de que para el tiempo en que se celebró la Convención Constituyente el Tribunal Supremo de Estados Unidos había resuelto ya que las legislaturas estatales podían válidamente excluir a ex-convictos como el del caso de autos de actividades tales como el ejercicio de una profesión [33], fortalece nuestro convencimiento al examinar las deliberaciones sobre el asunto de la rehabilitación de los reclusos, de que en la Convención Constituyente no hubo intención alguna de proscribir constitucionalmente el discrimen contra ex-convictos que pueda tener una empresa privada en la contratación de sus empleados.

No es función de este Tribunal formular interpretaciones de disposiciones constitucionales que son contrarias a su

---

[31] 85 Marq. L. Rev. 779 (2002).

[32] 22 UHILR 709 (2000).

[33] Hawker v. New York*, 170* US 189 (1898). Es conocido que en la Convención Constituyente se tuvo muy en cuenta las decisiones del Tribunal Supremo de Estados Unidos sobre asuntos constitucionales. Véase, Fernós Isern, *Original Intent in the Constitution of Puerto Rico*, 2nd Ed. (2002); y Trías Monge, *supra*, pág. 170.

Debe señalarse que el Tribunal Supremo federal no sólo ha reiterado lo resuelto en Hawker v. N.Y., sino que en una serie de casos posteriores ha indicado claramente que las clasificaciones legislativas relativas a ex-convictos no son sospechosas, y que el Estado puede válidamente excluirlos de actividades tales como votar, poseer armas de fuego y ocupar determinados cargos públicos o privados. Véase, Lewis v. U.S., 445 US 55 (1980); Richardson v. Ramírez, 418 US 24 (1974); De Veau v. Braisted, 363 US 144 (1960); y Lassiter v. Northampton Board of Elections, 360 US 45 (1959).

verdadero sentido y propósito, aunque la interpretación propuesta sea en pro de una buena causa. A las metas ideales no se puede llegar por caminos fallidos porque de algún modo tal proceder siempre acaba por denostar la meta misma.

## VI

Hoy, por razón del empate surgido en el Tribunal con respecto a este asunto, se confirma el vago dictamen del foro apelativo. El caso, pues, volverá al foro de instancia sin una pauta imperativa que guíe su proceder.

Por los fundamentos expuestos, disiento del tal curso de acción. Yo denegaría la acción de Rosario por inmeritoria y archivaría el asunto.

Jaime B. Fuster Berlingeri
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Wilfredo Rosario Díaz, Ruth
Fontanez Alicea y la Sociedad
Legal compuesta por ambos

     Recurridos

                        CC-2002-825

      v.

Toyota de Puerto Rico Corp.,
*et al.*

     Peticionarios


Opinión disidente particular de la Juez Asociada señora
Rodríguez Rodríguez



San Juan, Puerto Rico a 24 de octubre de 2005.

Disiento por entender que no existe en Puerto Rico una causa de acción por discrimen laboral por condición social bajo la Constitución del Estado Libre Asociado de Puerto Rico, bajo la modalidad de discrimen por convicciones criminales previas. Conforme se desprende **claramente** de la Opinión disidente del Juez Asociado señor Fuster Berlingeri, a la cual me uno, no fue la intención de quienes forjaron nuestra Carta de Derechos incorporar al Art. II, Sec. 1 de la Constitución, la modalidad de discrimen antes mencionada.

Escribo para dejar consignado que la Asamblea Legislativa, consciente de la problemática que se plantea en situaciones como la de autos, ha diseñado ya un mecanismo que permite conjurar los distintos intereses involucrados en la controversia ante nuestra atención, a saber: el deseo de propulsar mecanismos encaminados a facilitar la rehabilitación del convicto a través del empleo, con el interés genuino del patrono de tener ante sí toda la información necesaria sobre un potencial empleado a la hora de reclutamiento, de suerte que pueda tomar una decisión informada.

I

El Sr. Wilfredo Rosario Díaz fue entrevistado en dos ocasiones para ocupar el puesto de chofer de almacén en la corporación Toyota de Puerto Rico ("Toyota"). Mediante comunicación telefónica, Rosario Díaz fue notificado de que, antes de comenzar a trabajar, tenía que realizarse unas pruebas de dopaje, así como tramitar el certificado de antecedentes penales y el de salud.

El señor Wilfredo Torres Rodríguez, coordinador de recursos humanos en Toyota, recibió el certificado de antecedentes penales, el cual hacía constar que el señor Rosario Díaz había sido convicto de homicidio involuntario y de una violación a la Ley de Armas. Dichas convicciones habían ocurrido aproximadamente 20 años atrás, cuando él tenía 21 años de edad. Rosario Díaz alegó que **había**

**realizado diligencias para eliminar del récord dichas convicciones, pero que las mismas habían sido infructuosas.**

Posteriormente, un ejecutivo de Toyota le informó a Rosario Díaz que se rechazaba su contratación debido a las convicciones previas. A raíz de esto, el señor Rosario Díaz, su esposa Ruth Fontanez Alicea y la Sociedad Legal de Gananciales compuesta por ambos presentaron una demanda contra Toyota sobre violación de derechos civiles, daños y perjuicios e impugnación de la Ley Núm. 254 de 27 de julio de 1974, 34 L.P.R.A. sec. 1725. Alegaron que la actuación de Toyota constituía discrimen por condición social, además de una intrusión ilegal y caprichosa en su intimidad.

Ante la presentación de una moción de desestimación por parte de Toyota, el Tribunal de Primera Instancia concluyó que la demanda no exponía una causa de acción que justificara la concesión de un remedio. A pesar de ello, el Tribunal de Apelaciones revocó al tribunal de instancia ya que entendió que, en una interpretación liberal a favor del demandante, éste podría ser acreedor en derecho a la concesión de un remedio bajo la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico.

Inconforme con la determinación del tribunal apelativo intermedio, Toyota recurrió a nosotros solicitando la revocación del dictamen emitido por ese foro, por entender que el demandante Rosario Díaz, no era acreedor de algún remedio en ley.

II

Iniciamos señalando expresamente que compartimos la preocupación del recurrido sobre las vicisitudes que confrontan las personas convictas de delito a la hora de procurar empleo, estigmatizados por un récord criminal. Récord, que se convierte en mácula indeleble en sus vidas dificultando el camino hacia la plena rehabilitación. Entiendo sin embargo, que ese problema ha sido atendido mediante legislación por la Asamblea Legislativa. Veamos.

La Asamblea Legislativa ha sido consciente de estas preocupaciones y ha estimado que es mediante el relajamiento de las exigencias de la Ley Núm. 108 de 21 de junio de 1968, 34 L.P.R.A. sec. 1731 *et seq.*, que regula el procedimiento y las circunstancias bajo las cuales se enmienda el récord de antecedentes penales, que se debe atender esta problemática. Tal vez nos parezca que ello no es suficiente, tal vez estimemos que esa respuesta queda trunca y que se requieren medidas de mayor arrojo para resolver de una vez y por todas un problema que clama por solución, pero no es a nosotros, los jueces, a quienes les corresponde hacer esa evaluación.

En el presente caso, el certificado de antecedentes penales entregado por el señor Rosario Díaz reflejaba una convicción por homicidio involuntario y una violación a la Ley de Armas. Dicha convicción ocurrió hace aproximadamente veinte (20) años. La Ley Núm. 108 provee que la persona convicta de un delito grave puede solicitar la eliminación de esa convicción de su récord penal transcurrido diez (10) años desde la convicción. 34

L.P.R.A sec. 1731. Por otro lado, cuando la convicción es por un delito menos grave, la misma se eliminará del récord penal transcurridos tres (3) años desde la convicción. 34 L.P.R.A. sec. 1731.

Los términos antes descritos son el resultado de la aprobación, en el año 2000, de la Ley Núm. 367, que enmendó los plazos previamente dispuestos en la Ley Núm. 108. Así, previo a la aprobación de la Ley Núm. 367, el ordenamiento proveía que las convicciones por delitos menos graves se eliminarían del récord penal a los cinco (5) años de la convicción y los delitos graves a los quince (15) años.[34] La Exposición de Motivos de la Ley Núm. 367 hizo claro que **el objetivo de dicha enmienda era precisamente, facilitar la eliminación del récord criminal de convicciones previas, una vez cumplida la sentencia, ante la dificultad que enfrentan los convictos para obtener empleo.** La flexibilización de los requisitos de la Ley Núm. 108, allana el camino para obtener un empleo lo que sin duda facilita la rehabilitación del convicto. La Exposición de Motivos de la Ley Núm. 367 así lo expresa:

> El sistema de derecho mantiene penalizados a los convictos por delitos menos graves, al mantener en su expediente de conducta la convicción por un término excesivo de años que **constituye otra penalidad para aquel que interese solicitar un empleo, ya que no le permitirá conseguir un trabajo que le ayude a rehabilitarse e integrarse a nuestra sociedad. El noventa por ciento (90%)**

---

[34] Véase Ley Núm. 44 de 1 de junio de 1983.

> **de las empresas privadas y del gobierno requieren un Certificado Negativo de Antecedentes Penales a las personas que solicitan empleo. En la mayoría de los casos se les deniega el empleo por la convicción existente en su certificado, convicción que permanece por un exagerado número de años.**
>
> . . .
>
> **La aprobación de esta medida contribuirá a la rehabilitación de miles de personas que en la actualidad sufren la estigma de una convicción por delito menos grave o grave, lo cual limita su pleno desenvolvimiento en nuestra sociedad y su total rehabilitación.** (Énfasis nuestro).

Cabe destacar también que dos años más tarde, la Asamblea Legislativa enmendó nuevamente la Ley Núm. 108 para flexibilizar aun más sus requerimientos. Así, mediante la aprobación de la Ley Núm. 174 de 16 de agosto de 2002, se proveyó un mecanismo que autoriza al tribunal a, discrecionalmente y en casos meritorios, eliminar las convicciones previas del récord penal en un término menor al establecido en la Ley Núm. 108. La Ley Núm. 174 permite, a modo de excepción, la eliminación del récord penal en un término de un (1) año de la convicción en casos de delitos menos graves y de cinco (5) años en los delitos graves. Para ello, es necesario que la persona haya cumplido la sentencia impuesta y el Secretario de Corrección y Rehabilitación haya expedido una carta de referencia. En estos casos el tribunal deberá evaluar el expediente social y criminal del convicto, así como los informes socio-penales que acrediten su rehabilitación para así proceder. Por lo tanto, con esta enmienda, los términos de tres (3) y diez (10) años de la Ley Núm. 108

según enmendada por la Ley Núm. 367 pueden reducirse significativamente, si se cumplen con los requisitos de la ley.

Las leyes antes mencionadas ponen de manifiesto un patrón consistente de parte de la Asamblea Legislativa de reducir el tiempo que tiene que transcurrir y las condiciones que deben concurrir, para eliminar las convicciones del récord penal. Cambios que la Asamblea Legislativa ha propulsado en su deseo de propiciar en todo lo que sea dable la rehabilitación del convicto.

La Asamblea Legislativa ha sido consciente de los problemas que aquejan a la fuerza trabajadora propiciando, a través de los años, abundante legislación en su beneficio. A manera de ejemplo podemos referirnos a: Ley de Hostigamiento Sexual en el Empleo, 29 L.P.R.A sec. 155 *et seq.*; Ley para Reglamentar las Pruebas para la Detección de Sustancias Controladas en el Sector Privado, 29 L.P.R.A. secs. 161 *et seq.*; Ley de Despido Injustificado, 29 L.P.R.A. secs. 185a *et seq.*; Ley de Protección a Empleados –para proteger los empleados de discrimen por testificar en procedimientos judiciales, legislativos o administrativos-- 29 L.P.R.A. secs. 193 *et seq.*; Ley de Salario Mínimo, Vacaciones y Licencia por Enfermedad, 29 L.P.R.A. secs. 205 *et seq.*; Ley de Seguridad y Salud en el Trabajo, 29 L.P.R.A. secs. 361 *et seq.*; Ley de Madres Obreras, 29 L.P.R.A. secs. 467 *et seq.*; Ley para Garantizar la Igualdad de Oportunidades en el Empleo por

Género, 29 L.P.R.A. secs. 1201 *et seq.*; Ley de Discrimen

por Razón Sexo, 29 L.P.R.A. secs. 1321 *et seq.*; Ley para la

Igualdad de Oportunidades de Empleo para Personas con

Impedimentos, 29 L.P.R.A. secs. 1401 *et seq.*, entre otras.

Más sin embargo, no ha estimado necesario, al presente,

introducir a nuestro ordenamiento jurídico una modalidad de

discrimen basado en convicciones anteriores. Corresponde a

la Asamblea Legislativa y no a nosotros, proveer si lo

estima conveniente, mecanismos adicionales para facilitar

la rehabilitación del convicto una vez éste ha cumplido su

condena.


                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada